EBERWEIN *v.* EBERWEIN

[No. 142, October Term, 1948.]

*Decided April 29, 1949.*

The cause was argued before MARBURY, C. J., and DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Hyman Ginsberg*, with whom were *Philip H. Goodman* and *Ginsberg & Ginsberg* on the brief, for appellant.

The Court declined to hear argument for appellee. *C. Arthur Eby* and *John W. Smith*, on the brief for appellee.

COLLINS, J., delivered the opinion of the Court.

On March 19, 1948, Frances E. Eberwein, appellant, filed a bill of complaint in Circuit Court No. 2 of Baltimore City against her husband, Frederick W. Eberwein, appellee, for a divorce *a mensa et thoro*, alimony *pendente lite*, permanent alimony and counsel fee, alleging that he deserted her on January 22, 1948, and also that he had beaten her on a number of occasions. The appellee answered the bill denying the desertion and alleging that the separation of the parties "took place at that time wholly because of the cruel and intolerable attitude of the plaintiff, which made it impossible for the plaintiff and defendant to live together in peace and harmony and that the defendant was obliged to leave the place of abode where he and the plaintiff resided, on the advice of his physician because of the cruel and vicious conduct of the plaintiff toward the defendant which endangered the person and health of the defendant and caused him reasonable apprehension of bodily suffering."

Testimony was taken in open court and the Chancellor by decree on October 19, 1948, dismissed the appellant's bill. From that decree the appellant appeals. No cross bill was filed by the appellee. We are of opinion that the

decree of the Chancellor should be affirmed because the appellant constructively deserted the appellee.

The following facts were presented in the testimony. The parties to this case were married at Elizabeth, New Jersey, by the Mayor on January 12, 1946. The appellee had served in the United States Army where appellant was a cadet nurse. Before entering the Army the appellee had been employed for a number of years at the Baltimore City Post Office. The appellant was a graduate of State Teacher's College, Trenton, New Jersey, with a Bachelor of Science degree and had three years credit toward a nursing school degree. Two weeks after their marriage they returned to Baltimore City and lived with the appellee's parents for a few weeks. They then moved into an apartment at the home of Mrs. Ida Carney where they resided until September, 1947, when they were evicted because of quarrelsome and loud noises in their apartment. They removed to an apartment on Woodlea Avenue, Baltimore, where they lived for several months until they were asked to leave on account of their violent arguments. They then purchased, as tenants by the entireties, for the price of $10,000 a property on Ridgecroft Road in Baltimore for which they paid $3,000 in cash and gave a purchase money mortgage to appellee's uncle, Frank Moran, for the balance of $7,000. They later converted this property into two apartments. The wife, at the time of the decree, was still living in one apartment and keeping the rent from the other. No children have been born as a result of this marriage.

Upon his discharge from the Army the appellee resumed his position in the Baltimore City Post Office. He suffered severe headaches for which he was allowed a disability rating of ten per cent by the Government on account of his Army service. He claims that these headaches were brought on by the quarreling of his wife. During the two years the parties lived together he says he lost 123 days work at the post office, 100 days of which were caused by headaches. He says since the separation of the parties he has lost no time from his

employment. At the time of the separation and at the time of the decree the appellant was employed at a salary of $33 per week by the Social Security Department of the Government. The appellant accused her father-in-law, both verbally and in letters to third persons, of attacks upon her on fourteen different occasions. This is denied by the father-in-law. There is no proof of these accusations of the appellant. When she reported these attacks to her husband he insisted she go to the police station to bring charges, which she consistently refused to do on every occasion. She also accused appellee's father and mother of stealing articles from stores in Baltimore and Atlantic City. She said that her mother-in-law taught her own children to steal. There is no evidence to support these charges. Appellee testified that his wife denied the existence of God and objected to his attending church. In fact, she wrote a letter to the church of which her husband was a member that he was no longer a member of that church, to which she signed her husband's name without his consent. She accused her husband and his mother, who at various times was employed at the post office, of stealing articles there. There is no proof of these accusations. However, as a result of the appellant's continued calls at the post office making accusations against her husband and her mother-in-law, the post office authorities asked them to resign their positions, which they did. Both obtained employment elsewhere. They later offered to re-employ the mother-in-law. After the mother-in-law left the post office she obtained employment with the General Plumbing Supply Company. The appellant went there and told the manager that her mother-in-law was carrying articles out of the store and selling them to her relatives. As a result of these accusations the mother-in-law was thoroughly investigated by her employers and completely exonerated. Eight days before the separation the appellant wrote a letter to Mr. and Mrs. Baer, the father-in-law and mother-in-law of Bernard E. Eberwein, a brother of the appellee, in which she accused her father-

in-law of attacking her on fourteen occasions and accused her mother-in-law and father-in-law of lying, stealing, and cheating. Also before the separation she wrote a letter to Mrs. Dorothy Eberwein, wife of Parker Eberwein, a brother of the appellee, accusing her father-in-law of attacking her and advising her and her husband to be careful in their dealings with the mother-in-law and father-in-law. The appellee admits that he struck his wife on one occasion when she wrote him a note on his birthday and accused his mother of being a whore and a prostitute. Apparently this is the occasion testified to by appellant's mother and uncle as to a blow struck by the husband.

The appellant in her testimony before the Chancellor accused her husband of stealing from the Acme and A & P stores while shopping there. However, she could not fix the time of these thefts. She admitted that she advised the persons at the A & P store to watch her husband when he came there. There is no evidence to bear out the wife's accusations. The appellee testified that on one occasion his wife cut him with a knife on the hand and there is testimony that he was treated at the hospital. The appellee testified that the wife made assaults upon him on various occasions because he would not say "There is no God".

On January 22, 1948, the day of the separation, while appellant was at work, the husband returned from his work and found a note from his wife making accusations against his mother. He said that these accusations had been made so often he became so excited that he could scarcely eat his supper. He then told the appellant's mother, who lived with them at that time, that he was sick and was going to see Dr. Lang. He said he then called his father and together they went to see Dr. Lang, who examined him and told him that his condition was caused by his marital troubles and that he should get away from his wife. He returned home and told his mother-in-law that the doctor had told him to leave his wife. He packed his clothes and left. A letter was ad-

mitted in evidence from Dr. Lang stating that the appellee had been under his care because of nervousness, probably induced by his marital difficulties. After the appellee left, the appellant changed the lock on the door and when he tried to get in the apartment, had him summoned before a police magistrate. The day after the separation the appellant wrote a letter to a Mr. Ford, an insurance agent and a casual acquaintance, and told him that her husband had deserted her and inquired about the insurance. In that letter she wrote that he father-in-law had attacked her at least fourteen times, with his wife and son in the house, and also accused her mother-in-law of stealing from the post office and her father-in-law of stealing from the plant where he had worked for many years. In reference to her mother-in-law and father-in-law she wrote: "They steal, make trouble, gossip, and on Sundays pretend they are not bad, under the cover of religion".

After the separation the mother of the appellee employed an attorney. She showed him letters, cards, memorandums of very malicious character written to her, to her minister, and to the post office authorities by the appellant. This attorney succeeded in having the appellant come to his office, accompanied by her attorney, where the appellant signed a letter in which she agreed to desist from writing any further letters or postcards to her mother-in-law. On that occasion the mother-in-law's attorney suggested a reconciliation between the parties. The appellant became enraged and stated that under no circumstances would she become reconciled with her husband. The appellee's brother, Bernard, who has been employed since 1936 as a security trader with a reliable banking firm in Baltimore, testified that his father and mother are honest people and that his mother did not teach her children to steal but brought "my brothers and myself up as good Christian children".

It has been stated many times by this Court that a single act of violence will ordinarily not justify a divorce on the grounds of cruelty. Marital neglect, indifference,

failure to provide as freely as the wife may desire in dress or conveniences, sallies of passion, harshness, rudeness and use of profane and abusive language do not constitute cruelty as grounds for a divorce. Only danger to life, limb, or health will constitute such cruelty. *Short v. Short,* 151 Md. 444, 135 A. 176; *Porter v. Porter,* 168 Md. 296, 303, 177 A. 464; *Bradshaw v. Bradshaw,* 189 Md. 322, 55 A. 2d 719, 720.

It was said by Chief Judge Bond in the case of *Kruse v. Kruse,* 179 Md. 657, at page 663, 22 A. 2d 475, at page 478, which is appropriate here: "It is settled that conduct of one spouse which compels the other to leave may justify a divorce to that other on the ground of desertion, even though the conduct may not justify a divorce on the ground of cruelty. *Harding v. Harding, supra* (22 Md. 337) ; *Singewald v. Singewald,* 165 Md. 136, 137, 166 A. 441. It must, however, render impossible the continuation of matrimonial cohabitation with safety, health, and self-respect. *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259. And putting aside for the moment the question of this wife's responsibility, this court, concurring with the chancellor, concludes that her actions did render it practically impossible for the husband to continue living with her longer than he did. As described in the record it was such as would break the patience of any husband. His work and livelihood would have been jeopardized if he had continued, and peaceful living seems to have been impossible." Constructive desertion may consist of conduct which makes life unbearable. *Fischer v. Fischer,* 182 Md. 281, 292, 34 A. 2d 171; *Collins v. Collins,* 184 Md. 655, 663, 42 A. 2d 680. To justify separation the misconduct of the other spouse must be such as would render it impossible for the party who leaves the other to continue the matrimonial cohabitation with safety, health and self-respect. *Hastings v. Hastings,* 147 Md. 177, 127 A. 743; *Brault v. Brault,* 189 Md. 175, 55 A. 497, 499. There is no claim in this case that the appellant is not responsible or that she is mentally impaired.

The evidence in this case in the opinion of this Court is such as to show that the husband could not with safety to his health and with self-respect continue to live with his wife. It is difficult to understand why a wife would openly and groundlessly accuse her husband of lying and stealing. Such accusations would affect the health of any man. It is apparent that the groundless accusations made against the father of repeated attacks, and made against the father and mother of lying and stealing, were such as to seriously affect the health of this husband. The accusations against appellee's father of fourteen separate attacks in the letter to Mr. Ford, a mere acquaintance, in which she stated that they were committed in the house with his wife and son, are incredible. Such accusations, together with her charges against the appellee of lying and stealing without proof, are enough to make peaceful living between the parties here impossible. We are of opinion that the husband's work and livelihood would have been seriously jeopardized if he had continued to live with his wife. Her conduct was such as to break the patience and impair the health of any husband. *Geisey v. Geisey,* 190 Md. 618, 59 A. 2d 319, 323. The fact that the husband's health was impaired is corroborated by medical testimony.

As to the wife's claim that she sought reconciliation with her husband, any effort on her part seeking reconciliation appears not to have been made in good faith or really intended to be performed. *Zukerberg v. Zukerberg,* 188 Md. 428, 53 A. 2d 20, 24.

This case is one in which the atmosphere of the trial, the appearance and demeanor of the witnesses is invaluable in reaching a correct and just conclusion. The Chancellor had the opportunity of observing the witnesses and their demeanor on the stand. If the record of the case before us left us in doubt, which it does not, we should not disturb his findings. *Collins v. Collins, supra; Smith v. Smith,* 192 Md. 111, 63 A. 2d 628, 631.

*Decree affirmed, appellee to pay the costs.*